Renato C. Stabile
Attorney at Law
580 Broadway, Suite 400
New York, NY  10012
212-219-1469 (o)
212-219-1897 (fax)
917-204-0181 (mobile)
renato.c.stabile@gmail.com

January 26, 2024

**VIA ECF**
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Juan Orlando Hernandez, et al*, 15 Cr. 379 (PKC)

Dear Judge Castel:

      We write on behalf of defendant Juan Orlando Hernandez regarding the January 22, 2024 Supplemental Motion In Limine (Dkt. 667) filed by codefendant Mauricio Hernandez Pineda ("Pineda"), seeking a severance of his trial on the ground that codefendant Juan Carlos Bonilla Valadres ("Bonilla") intends to testify against both Mr. Pineda and our client and offer supposedly incriminating documents into evidence or refer to them. We agree that Mr. Hernandez and Mr. Bonilla should not be tried together and that a severance is appropriate.

      A severance is warranted because Mr. Bonilla does not merely intend to offer an "antagonistic defense" against his codefendants or engage in the type of finger-pointing inherent in multi-defendant trials. Mr. Bonilla intends to go a step further by becoming a second prosecutor at the trial. It appears that he intends to testify against his codefendants and tell the jury that his codefendants are criminals and liars, who he personally investigated in Honduras, as a high-ranking Honduran law enforcement official. Mr. Bonilla will seek to introduce highly prejudicial and perhaps otherwise inadmissible evidence of other crimes allegedly committed by his codefendants. This testimony goes beyond being antagonistic and may exacerbated because Mr. Bonilla's credibility may be bolstered by his position as a previous leader of Honduran law enforcement.

The situation faced by Mr. Hernandez and Mr. Pineda is unlike anything faced by the defendants in the cases upon which the Government relies in opposition – *United States v. Cardascia*, *United States v. Yousef*, *United States v. Scott*, and *United States v. Shkreli* – none of which involved the ***testimony of a defendant against his codefendants*** and mounting a case against them. Instead, in the cases relied on by the Government, courts have denied severance where defenses were merely antagonistic or possibly inconsistent with respect to defense counsels' arguments to the jury (which are not evidence) or their theories of defense amounted to finger-pointing; a very different situation from the one presented here. Instead, this case is more similar to cases in which codefendants went on the offensive to aggressively attack each other at trial, including in *United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990), *United States v. Shkreli*, 260 F.Supp.3d 247 (E.D.N.Y. 2017), *United States v. Copeland*, 336 F.Supp.2d 223 (E.D.N.Y. 2004), and *United States v. Nordlicht*, 2018 WL 1796542 (E.D.N.Y. 2018).

**Mr. Bonilla's Anticipated Trial Testimony**

As detailed in Mr. Pineda's January 22, 2024 Supplemental Motion in Limine, Mr. Bonilla is expected to testify, among other things, that: (i) while the other charged defendants may in fact be members of the charged conspiracy, Mr. Bonilla himself was not; and (ii) the government's cooperating witnesses have colluded and conspired to wrongfully accuse Mr. Bonilla to exact revenge against Mr. Bonilla for his previous work as a high-ranking Honduran law enforcement official who investigated and prosecuted many of the individuals and activities involved in the instant case.

With respect to Mr. Hernandez, our understanding is that Mr. Bonilla will testify, in sum and substance, that: (i) Mr. Pineda was a member of the Honduran National Police ("HNP") who is related to co-defendant Juan Orlando Hernandez and, due to their familial relations, Mr. Pineda was the beneficiary of protection and preferential treatment; (ii) Mr. Pineda is an affiliate of known drug-traffickers; (iii) Mr. Pineda was the subject of an investigation into HNP corruption headed by Mr. Bonilla, during which it was determined that Mr. Pineda failed a polygraph test, leading to Mr. Pineda's suspension; (iv) Mr. Pineda was eventually reinstated to his original position within HNP, due to his familial relationship with Juan Orlando Hernandez; and (v) consistent with statements made by Mr. Bonilla at his August 1, 2022, proffer with the government, Mr. Pineda participated in drug trafficking activities by gathering firearms seized by law enforcement from drug trafficking organizations and returning those firearms to drug traffickers.

We also understand that in furtherance of his defense, Mr. Bonilla will seek to offer into evidence portions of his investigation files from Mr. Bonilla's tenure as a Honduran law enforcement official (the "Bonilla Files") and that these files will at a minimum implicate Mr. Pineda as an affiliate of drug traffickers, including government cooperating witness Amilcar Alexander Ardon Soriano and implicate Mr. Pineda as the subject of investigations into police corruption, with Mr. Hernandez serving as Mr. Pineda's alleged political protector.

**A Severance is Warranted Where One Codefendant Will Mount a Case Against Another**

Severance "should be granted when antagonism at the essence of the defenses prevails to such a degree—even without being mutually exclusive—that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." *United States v. Van Hise*, No. S4 12 Cr. 847 (PGG), 2013 WL 6877319, at *12 (S.D.N.Y. 2013) (citing *United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990)) (internal quotation marks omitted).

The Second Circuit in *Serpoosh* concluded that the trials of codefendants should have been severed, where the codefendants <u>testified</u> against each other and their lawyers also accused the other defendant of being guilty, in an undercover drug sale, where at least one of the defendants had to be guilty, under the facts of the case. After the severance analysis, the Court added, "the damage done was greatly enhanced by the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted his story to escape blame. There was, therefore, the 'substantial prejudice' needed to reverse the denial of the severance motion." 919 F.2d at 838.

The many perils of allowing codefendants to aggressively attack each other at trial was discussed by the Ninth Circuit in *United States v. Tootick*, 952 F.2d 1078 (9th Cir. 1991), an assault case in which unsevered codefendants' convictions were reversed, after one defendant testified against the other. As the Court in *Tootick* discussed:

> Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor. Opening statements, as in this case, can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the "other" defendant. In this case, these claims were not all substantiated by the evidence at trial. Counsel can make and oppose motions that are favorable to their defendant, without objection by the government.
>
> Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant or to help rehabilitate a witness that has been impeached. Cross-examination of the defendant's witnesses provides further opportunities for impeachment and the ability to undermine the defendant's case. The presentation of the codefendant's case becomes a separate forum in which the defendant is accused and tried. Closing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime.

> Joinder can provide the individual defendants with perverse incentives. Defendants do not simply want to demonstrate their own innocence, they want to do everything possible to convict their codefendants. These incentives may influence the decision whether or not to take the stand, as well as the truth and content of the testimony.
>
> The joint trial of defendants advocating mutually exclusive defenses produces fringe benefits for the prosecution. Joinder in these cases can make a complex case seem simple to the jury: convict them both.
>
> The government's case becomes the only unified and consistent presentation. It presents the jury with a way to resolve the logical contradiction inherent in the defendants' positions. While the defendants' claims contradict each other, each claim individually acts to reinforce the government's case. The government is further benefited by the additive and profound effects of repetition. Each important point the government makes about a given defendant is echoed and reinforced by the codefendant's counsel.
>
> Joinder of defendants who assert mutually exclusive defenses has a final subtle effect. All evidence having the effect of exonerating one defendant implicitly indicts the other. The defendant must not only contend with the effects of the government's case against him, but he must also confront the negative effects of the codefendant's case.

*United States v. Tootick*, 952 F.2d 1078, 1082–83 (9th Cir. 1991)

For many of the reasons articulated in *Tootick*, courts in this circuit have granted severances in circumstances far less prejudicial than the one faced by Mr. Hernandez, where his codefendant plans to testify against him.

In *United States v. Shkreli*, 260 F.Supp.3d 247 (E.D.N.Y. 2017), the district court granted severance of Martin Shkreli and his lawyer, Evan Greebel, even though the court found that the defendants had not shown that their defenses were mutually antagonistic. The court granted a severance because "a joint trial would place on Shkreli an unfair and heavy burden in defending himself against both the government and Greebel." 260 S.Supp.3d at 256. The court went on to state that: "Severance is granted because of the stated intention of Greebel's counsel, in his declaration (ECF No. 159) and at oral argument, that Greebel's defense team will act as a second prosecutor against Shkreli, by arguing that Shkreli is guilty and that Greebel is, himself, just another victim of Shkreli's fraud. (Transcript of Oral Argument on Severance Motions held on April 7, 2017 ("Tr.") Tr. at 52, 54.) Greebel's counsel intends to assert a defense that will be an 'echo chamber' for the prosecution by presenting evidence of multiple instances of Shkreli's purported lies, deceptions, and misrepresentations. (Tr. at 74–77.) The court recognizes that counsel's arguments are not evidence, and the jury will be so instructed, however, the underlying theme of Greebel's defense, that Shkreli lied, committed fraud, and is guilty, will permeate a joint trial to the substantial prejudice of Shkreli. Through such double prosecution of Shkreli by

4

the government and Greebel, there is a serious risk that the jury would be prevented from making a reliable judgment about guilt or innocence even with limiting instructions by the court." *Id*.

The court in Shkreli concluded that "The circumstances here are not solely one of "co-defendants seek[ing] to place the blame on each other." *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990). Rather, one defendant, Shkreli, intends to present a defense that no crime was committed because he lacked the requisite intent, while his co-defendant, Greebel, intends to present evidence and argue that Shkreli is guilty as charged, and that Greebel is but another victim of Shkreli's lies and deceitfulness—a pawn in 'fraudulent schemes unbeknownst to [him].' (Declaration of Reed Brodsky, ECF No. 159.) These defenses amount to more than simple finger pointing by two defendants. Rather, the defense strategy of Shkreli's co-defendant presents a realistic scenario that Shkreli will be prosecuted, not only by the government, but also by Greebel, his co-defendant. Shkreli will be substantially prejudiced by having to wage a defense on two fronts, in a single trial, before the jury. The jury's ability to make a reliable judgment maybe affected by the compounded effect of hearing the government's case in chief twice, once from the government and then again from Greebel. Such a burden on Shkreli causes the court great concern and rises to the level of 'legally cognizable prejudice' that likely meets the level of denying Shkreli a constitutionally fair trial. *See Zafiro*, 506 U.S. at 539, 113 S.Ct. 933." *Id*. at 257.

The situation here is far worse than in Shkreli, where the court was merely concerned with defense counsel's "arguments" and finger pointing. Here, one codefendant will take the stand against another codefendant and seek to introduce evidence of his codefendant's alleged criminality, lies, and corrupt political protection. Like Shkreli, Mr. Hernandez will have to wage a defense on two fronts in a single trial: defend against the Government's false allegations and defend against Mr. Bonilla's false allegations.

In *United States v. Copeland*, 336 F.Supp.2d 223 (E.D.N.Y. 2004), the district court severed bank robbery codefendants where one defendant intended to accuse the other of committing the bank robbery. The court granted severance, finding that it was a case where "in effect, [defense] counsel becomes a second prosecutor…." (citations omitted) and because "the jury may convict [the codefendant] based upon either the government's theory of [his codefendant's] theory." 336 F.Supp.2d at 224.

In *United States v. Nordlicht*, 2018 WL 1796542 (E.D.N.Y. 2018), the district court severed a defendant who intended to accuse his codefendants of fraud and claim to be an unknowing pawn. The court noted several problems with this. First, it would subject his codefendants to "double prosecution," which the court described as "an order of magnitude more severe than routine accusations and blame-shifting between codefendants." 2018 WL 1796542 *2. The court noted that having one defendant accuse his codefendants would create several problems, including burdening the codefendants with "having to parry off his accusations in addition to the Government's, seriously adding to the difficulty of their defense." The court found that "although the Government has ethical commitments and disclosure requirements, [the accusing defendant] would not have parallel obligations. This would both disadvantage his co-defendants by compelling them to respond to his accusations, and secure an advantage for the Government. This is because to the extent that it would have relied on arguments that overlap

5

with [the codefendant's], the Government could instead let him make those arguments without then having to make relevant disclosures to his codefendants." *Id*. at *3. Finally, the court found that "even with rigorous limiting instructions, the jury will be confronted with a serious challenge in distinguishing the Government's case against Shulse's codefendants from *his* defense against the Government, which will entail a virtual case against the other defendants." *Id*.

The court in *Nordlicht* also expressed trial management concerns, because it anticipated "innumerable objections during openings and witness examinations and cross-examinations, along with frequent side bars. This risks adding to the complexity of an already challenging case, extending its length, and disrupting the parties' presentations, all of which will heighten the chances of jury confusion, further jeopardizing defendants' right to a fair trial." *Id*.

Here, the heart of Mr. Bonilla's and Mr. Hernandez's defenses conflict with one another. During the trial, there will be allegations of lying going back and forth between Mr. Bonilla's defense and Mr. Hernandez's defense. Mr. Bonilla will accuse Mr. Hernandez of protecting Mr. Pineda, who Mr. Bonilla will accuse of being affiliated with drug dealers, investigated by the Honduran police, and failing a polygraph test. Mr. Bonilla will seek to back up his claims with police files. Obviously, Mr. Hernandez will dispute those outrageously false allegations. The level of antagonism between these two defendants, and their respective defenses, will only increase during any joint trial such that there is grave risk that the jury will "unjustifiably infer" that both are guilty. As in *Serpoosh*, the government would be able to use the conflicts between the defendants' defenses against them, contrasting the "theoretical possibility" that both defense versions were true with the "realistic world in which neither defendants' story could be true." 919 F.2d at 838. A jury would be more inclined to disbelieve them both rather than sort through the many areas of disagreement.

In this case, the Government will gain an unfair advantage to the detriment of Mr. Hernanez's constitutional rights, because it will have the help of a second prosecution team in Mr. Bonilla, who intends to heap blame on and try to convict his codefendants. To zealously represent their clients, all defense counsel in this case will do everything ethically and legally permissible to demonstrate that their antagonistic codefendant is not credible. Yet "[t]he existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor." *Zafiro v. United States*, 506 U.S. 534, 544 n.3 (1993) (Stevens, J., concurring); *accord United States v. Copeland*, 336 F. Supp. 2d 223, 224 (E.D.N.Y. 2004) (holding irreconcilable defenses are so prejudicial to compel severance "where, as here, in effect, a defendant's counsel becomes a second prosecutor") (internal citations omitted).

The Government will also be assisted by the fact that Mr. Bonilla does not have to play by the same rules as the Government. For example, Mr. Bonilla is not required to produce all pre-trial discovery to Mr. Hernandez, such as *Brady* material, or prior statements Mr. Bonilla made to his attorneys, even if they are inconsistent with his trial testimony. He will have the advantages of trial by surprise against Mr. Hernandez, without the traditional due process safeguards that normally apply to an accuser, such as *Brady*. Since Mr. Bonilla is a represented party, Mr. Hernendez has no ability to attempt to interview him or investigate him in the same

ways other witnesses could be investigated. While Mr. Hernandez has a Fifth Amendment right not to testify in his own defense to dispute the Government's allegations, if he does not testify, the jury may be left wondering why he did not take the stand and defend himself against the disturbing allegations leveled by his codefendant, sitting right next to him. Finally, if Mr. Hernandez and Mr. Bonilla had separate trials, the Government would have no ability to call Mr. Bonilla as a witness against Mr. Hernandez and there would be no other vehicle for Mr. Bonilla's testimony against Mr. Hernandez to come into evidence.

The opening and closing statements in this case will be wild affairs in which Mr. Bonilla will tell the jury that his codefendant is a criminal and a proven liar, who he personally investigated in Honduras, but who was helped by his relationship with the other codefendant (Mr. Hernandez), while his codefendants will point the finger right back and call him a liar. *Tootick*, 952 F.2d at 1082 ("[o]pening statements can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the 'other' defendant.").

The severe infighting that will occur between the defendants in front of the jury may cause the jury to unjustifiably infer that antagonism proves guilt, resulting in mutually assured destruction. The jury will likely infer that codefendants going after each other is merely evidence of guilty individuals seeking to blame each other. Consequently, the jury is more likely to reject both defenses and find them all guilty.[1]

A joint trial with Mr. Bonilla will also reinforce the prosecution's case against each defendant. Joinder will benefit the government to the detriment of the co-defendants via the profound effects of repetitive accusations against one another. When Mr. Bonilla accuses Mr. Pineda and Mr. Hernandez of criminal acts, it will reinforce the government's case against both of them. And when Mr. Hernandez accuses Mr. Bonilla of making up stories to help himself, it will reinforce the government's case against Mr. Bonilla.[2] As part of his defense, Mr. Bonilla

---

[1] *See also United States v. Romanello*, 726 F. 2d 173 (5th Cir. 1984) ("In this case, we are concerned with the specific prejudice that results when defendants become weapons against each other, clawing into each other with antagonistic defenses. Like the wretches in Dante's hell, they may become entangled and ultimately fuse together in the eyes of the jury, so that neither defense is believed and all defendants are convicted."); *see also United States v. Green*, 324 F. Supp. 2d 311, 325 (D. Mass. 2004) ("There is a considerable risk that each defendant, ably throwing pot-shots at the other, would make the government's case for it. Specifically, in the din, a juror could well say: 'I cannot figure out who did the shooting, given the defendants' mutual accusations, but it doesn't matter. They were involved somehow and that is enough.' That conclusion would redound to the government's benefit.").

[2] *See United States v. Lewis*, No. CRIM.A. 11-107, 2013 WL 6623898, at *3 (E.D. La. 2013) (granting severance where a co-defendant's testimony "will reduce the Government's burden to prove [the other codefendant] guilty beyond a reasonable doubt"); *United States v. Andrews*, No. 1:12CR100, 2013 WL 6230450, at *6 (N.D.W. Va. 2013) (granting severance because joinder would "reduc[e] the government's burden" especially where "the defense counsel are not always held to the limitations and standards imposed on the government prosecutor") (internal citation omitted).

may also try to reference alleged other crimes and bad acts he will claim were committed by his codefendants, which may not otherwise be admissible under FRE 404(b), but Mr. Bonilla will nevertheless claim are important to his defense.

The cases cited by the Government do not support a denial of severance. Besides *Shkreli*, in which a severance was *granted*, the Government relies on *United States v. Scott*, 637 Fed. Appx. 10, 13 (2d Cir. 2015). But in *Scott*, a codefendant attorney (Everette Scott) and his client (Tyronne Gilliams) both argued that they lacked the intent to commit the crime without accusing the other of doing anything wrong. The attorney Scott had argued that he lacked the intent to commit fraud because Scott followed his client's instructions; and the client Gilliams argued that he lacked the intent to commit fraud because he followed his attorney's advice. *Id*. But the attorney did not argue that the client was deceptive and lied to him; and the client did not argue that he provided complete and truthful information to the attorney and then relied on the subsequent advice of counsel. *Id*. There is also no indication in *Scott* that either defendant expressed an intention of testifying against each other or telling the jury that the other defendant was guilty, while they were innocent. The defendants there were simply not on the same collision course as the defendants in this case, because one defendant did not testify against the other defendant or seek to introduce evidence that his codefendant was a criminal and liar.

The Government also relies on *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003), but the facts in Yousef were also very different from this case. In *Yousef*, the defendants Ramzi Yousef and Eyad Ismoil appealed their convictions for their involvement in the February 1993 bombing of the World Trade Center. In a few paragraphs of the 173-page decision, the Second Circuit agreed with the district court that "Yousef has 'not articulate[d] any specific instances of prejudice. Instead, [he] contend[s] that the very nature of [his and Ismoil's] defenses, without more, prejudiced [him].'" 327 F.3d at 151. Among other reasons for the failure to articulate prejudice was that Ismoil has failed to argue at trial that he was "duped" into bombing the World Trade Center and thus the nature of his defense was not mutually antagonistic to Yousef's defense. *Id*. at 152.

Finally, the Government relies on *United Sates v. Cardascia*, 951 F.2d 474 (2d Cir. 1991), a case in which the denial of severance was upheld. In *Cardascia*, the Second Circuit found that the codefendants did not have defenses that were mutually exclusive at their core or essence, where both defendants claimed they were not members of the charged conspiracy. 951 F.2d at 485. *Cardascia* did not involve the situation of one codefendant taking the stand against another codefendant and calling him a criminal and liar, who was aided by the third codefendant. Nor was *Cardascia* a case in which one codefendant took the stand and told the jury that as a former member of law enforcement, he had actually investigated one of his codefendants and found that he failed a polygraph or sought to introduce law enforcement files against his codefendants.

8

**Conclusion**

For all of the reasons stated herein, the reasons stated in the January 22, 2024 and January 26, 2024 Supplement Motions in Limine of Mr. Pineda, and Mr. Hernandez's previously submitted motion for severance, dated February 3, 2023 (Dkt. 515), we request that the Court grant separate trials for Mr. Hernandez, Mr. Bonilla, and Mr. Pineda.

Respectfully submitted,

/s/

Renato C. Stabile

cc:   all counsel
      via ECF